UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KRISTIN H.,

Plaintiff,

                                                    Case No. 1:24-cv-00639-TK

     v.

COMMISSIONER OF SOCIAL             OPINION AND ORDER
SECURITY,

Defendant.

## OPINION AND ORDER

This case is before the Court to consider a final decision of the Commissioner of Social Security which denied Plaintiff's application for disability insurance benefits. That final decision was issued by the Appeals Council on May 6, 2024.  After filing the complaint in this case, Plaintiff  moved for judgment on the pleadings (Doc. 11) and the Commissioner filed a similar motion (Doc. 14).  For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## I.  BACKGROUND

Plaintiff protectively filed an application for disability insurance benefits on November 14, 2022, alleging a disability beginning on August 19, 2018.  After initial administrative denials of her application, Plaintiff took part in a hearing before an Administrative Law Judge on November 20, 2023.  Both Plaintiff and a vocational expert, Jay Steinbrenner, testified at the hearing.

The ALJ issued an unfavorable decision on December 26, 2023.  In that decision, the ALJ found, first, that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  Next, the ALJ determined that Plaintiff suffered from severe impairments including post-traumatic stress disorder, attention deficit hyperactivity disorder, major depressive disorder, degenerative disc disease of the lumbar spine, and asthma.  The ALJ further found that none of these impairments, considered singly or in combination, met or equaled the criteria for disability under the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the ability to perform a limited range of light work, concluding that she could no more than occasionally climb ramps and stairs but could not climb ladders, ropes, or scaffolds.  She was limited to occasional balancing, stooping, kneeling, crouching, and crawling.  She could

occasionally work at unprotected heights and around hazardous mechanical parts and could occasionally work in dust, odors, fumes, and pulmonary irritants but not in vibration.  From a mental point of view, she was limited to work involving simple, routine, repetitive tasks but not at a production pace, could make simple work-related decisions, and could interact occasionally with coworkers and supervisors but not with the general public.

Plaintiff had past relevant work as a paramedic, a medical technologist, and an appointment scheduler.  The ALJ determined, based on the testimony of the vocational expert, that Plaintiff could not perform any of those jobs, but she could do unskilled light jobs like cleaner housekeeper, stock checker, and injection molder assembler.  He also found that those jobs existed in significant numbers in the national economy.  As a result, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act.

In her motion for judgment on the pleadings, Plaintiff raises these arguments:

1.  Failure to properly evaluate the favorable RFC opinion of treating psychiatrist Dr. Tymeson under 20 C.F.R. §404.1520c.

2.  Improper substitution of the ALJ's "non-medical" judgment as a lay person over that of a psychiatrist or psychologist regarding Ms. Hand's mental limitations.

3.  The ALJ erred in failing to properly and individually assess the social limitations separately in interacting with supervisors, coworkers, and the public and in failing to provide substantial evidence to support limitations in each of the three groups.

Plaintiff's memorandum, Doc. 11-1, at 1.

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 42 years old at the time of the administrative hearing, first testified that she had applied for disability based on PTSD, ADD, depression, anxiety, shoulder and back issues, and carpal tunnel syndrome.  She was getting disability benefits from the VA and had not worked since her onset date.  Plaintiff said that various events triggered flashbacks for her.  On an average day, she saw her three-year-old son off to school and tried to take care of the house, but things were difficult for her due to back and hand issues as well as the PTSD and problems breathing.

Plaintiff was able to shop for groceries but tried to avoid crowds by going to the store in the early morning.  She also had been coordinating improvements to her home.  Plaintiff testified that she treated her back pain with ice and stretching as well as CBD cream.  She also said that

her military specialty was in diagnostic testing and she worked in that area after leaving the military but her civilian job ended for lack of funding.

Plaintiff described her treatment as consisting of monthly visits to a psychiatrist at the VA and taking medication to help her sleep and for intestinal issues. She also had been taking Topamax for migraines but discontinued that medication when she became pregnant. Plaintiff said she had stress and tension headaches on a daily basis and that she had difficulty focusing. She was also due for carpal tunnel surgery on her left wrist but it had gotten postponed for various reasons.

The vocational expert, Mr. Steinbrenner, categorized Plaintiff's past jobs as paramedic and medical technologist as well as appointment scheduler. He was then asked questions about a person with Plaintiff's vocational profile who could do a limited range of light work with postural and environmental restrictions and who could do only simple, routine tasks, make occasional work-related decisions, and interact occasionally with others in the workplace but never with the public. He responded that such a person could not do Plaintiff's past work but could be employed as a cleaner/housekeeper, stock checker, and injection molder. He also gave numbers for those jobs as they existed in the national economy. The expert further testified that the limit for being off-task was 15% of the workday, and even then, half the jobs he identified would be eliminated. None of the jobs would be available to someone off-task for 20% of the time. Further, being absent from work two or more days per month would lead to termination.

## B. Medical Evidence

The relevant medical records show the following. A list of Plaintiff's medical problems up through 2022 showed multiple impairments including ADHD, migraines, PTSD, asthma, depression, and lumbar spinal stenosis. She was taking various medications for those conditions and also participating in psychotherapy. Her goal in therapy was to control her hyperactivity and hyperarousal so that she could care for her son. The various treatment notes indicate symptoms such as hypervigilance, fatigue, anxiety, and persistent insomnia. She did report improved concentration when taking a stimulant and the fact that she was getting better control of her emotions. However, she was easily startled and reported some intrusive memories relating to her military service.

## C. Opinion Evidence

Plaintiff's treating psychiatrist, Dr. Tymeson, completed a questionnaire on November 30, 2023 on which she stated that Plaintiff had been under her care for eight years and that she suffered from chronic PTSD, attention deficit disorder due to traumatic brain injury, and insomnia. Her symptoms included overproductive speech, anxious affect and mood, obsessive rumination, and the likelihood of decompensation if she tried to work. She was easily distracted and suffered from recurrent panic attacks. Dr. Tymeson believed that Plaintiff could not maintain adequate attention or regular attendance, could not perform at a consistent pace or complete a workday or workweek without interruption from psychologically-based symptoms, could not get along with others, could not deal with work stress, and could respond to changes in

a routine work setting.  She would also miss more than four days of work per month and be off-task more than 25% of the time.  (Tr. 1043-47).  The state agency reviewers did not believe Plaintiff had any severe impairments.

## III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

## IV.  DISCUSSION

Plaintiff has presented three claims of error, as noted above, but they are interrelated.  All of them arise from the way in which the ALJ dealt with Dr. Tymeson's opinion and determined Plaintiff's mental residual functional capacity.  For that reason, it is important to set out the ALJ's rationale for his decision in some detail.

The ALJ first considered and rejected the opinions of the state agency reviewers.  He determined that they were not persuasive based on the fact that "the claimant still continues to report symptoms that would affect her ability to work."  (Tr. 25).  He then turned to an evaluation of Dr. Tymeson's opinion, and, after summarizing the key points in that opinion, provided this explanation for why it was also not persuasive:

I do not find this assessment generally persuasive, as it was not supported by any objective medical evidence, but rather subjective complaints made by the claimant. The assessment is inconsistent with the claimant's routine and conservative treatment, her ability to function living independently in the community, and her refusal to take most medications. Regarding the B criteria, I find that assessment somewhat persuasive. Overall, this assessment is inconsistent with the claimant's own testimony of activities of daily living. She is the primary caretaker for her child who has extensive delays, and she cares for her 77-year-old aunt. The claimant maintains a household and manages household finances. Specifically, this assessment is inconsistent with records showing a request to be on as little medication as possible (3F/9, 11). With the medications she is on, her providers not she is doing well on the medication (3F/11, 80).

(Tr. 25-26). The ALJ went on to say that

I accounted for the claimant's PTSD, ADHD, and major depressive disorder in the residual functional capacity above in that she is limited to simple, routine, and repetitive tasks but not at a production rate pace. She can have only occasional interaction with supervisors and coworkers. The claimant can never interact with the public.

(Tr. 26).

Turning to Plaintiff's specific arguments, she contends that the method by which the ALJ evaluated Dr. Tymeson's opinion does not comply with the current regulatory scheme in that it does not take into account the key factors of consistency and supportability and, in addition, gives no credence to the fact that Plaintiff and Dr. Tymeson enjoyed a lengthy treating relationship. She then asserts that without the benefit of any persuasive medical evidence, the ALJ improperly crafted a specific mental residual functional capacity even though, in cases involving psychological impairments, that is not something that is permitted through a common sense approach to the evidence. Finally, she argues that nothing in the record permitted the ALJ to distinguish between her ability to interact with others in the workplace and with the general public, and that this error is also grounds for remand. In response, the Commissioner contends that the ALJ properly determined that Dr. Tymeson's opinion was not supported by anything other than Plaintiff's subjective complaints and was inconsistent with both the record of conservative treatment and Plaintiff's activities of daily living. The Commissioner also asserts that the record of Plaintiff's interaction with others supports the ALJ's finding that she could relate adequately to others in the workplace but would have more difficulty dealing with the public.

This Court has explained how the regulations for evaluating expert medical opinions function after they were revised in March of 2017:

First, the new regulations change how ALJs consider medical opinions and prior

-5-

administrative findings. The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency. *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, the regulations also alter the way the ALJ discusses medical opinions in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

*Michael H. v. Comm'r of Soc. Sec.*, 2022 WL 768658, at *5 (W.D.N.Y. Mar. 14, 2022).

The Court agrees that the ALJ's analysis of Dr. Tymeson's opinion was somewhat deficient. As Plaintiff notes, a major criticism leveled by the ALJ at Dr. Tymeson was that her opinion was largely supported by Plaintiff's subjective complaints, but that is a valid basis for a psychological diagnosis. As the Court of Appeals has noted, "[p]sychiatric testing is inherently based on subjective reports. A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms." *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022). And that is especially true when the symptoms are consistently reported to a long-time treating source, a factor that the ALJ does not seem to have accounted for. Further, the balance of the ALJ's evaluation consists of a general statement that the opinion is inconsistent with Plaintiff's daily activities and with her desire to take less medication while breastfeeding. There was no apparent acknowledgment of her consistent report of symptoms to Dr. Tymeson, such as hypervigilance, intrusive thoughts, anxiety, fatigue, and insomnia.

This deficiency in applying the current regulations was compounded by the fact that the ALJ did not find any of the opinion evidence to be persuasive, but still crafted a very specific mental residual functional capacity. Plaintiff correctly notes that this Court has often held that,

especially in cases involving mental impairments, it is improper for an ALJ to substitute his or her own lay judgment for that of the medical professionals in determining how such an impairment impacts a claimant's ability to function in the workplace.  The Court has

> spoken in the past to the question of when an ALJ may make a residual functional capacity determination which does not match any of the opinion evidence. It said this about the Court of Appeals' decision in *Matta v. Astrue*, 508 Fed.Appx. 53 (2d Cir. Jan 25, 2013):
>
>> *Matta*, like the present case, involved an RFC which took into account, but did not mirror, the opinions of a number of different sources. The Court rejected the identical argument made by Plaintiff here - that the ALJ must necessarily have used his own lay opinion to craft the RFC because it did not match any one source's opinion - holding that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *See Matta v. Astrue,* 508 F. App'x 53, 56 (2d Cir. 2013). This Court has routinely applied that holding in similar situations. *See, e.g., Allen v. Comm'r of Social Security*, 351 F.Supp.3d 327 (W.D.N.Y. 2018).
>
> *Riley v. Comm'r of Soc. Sec.*, 2019 WL 5287957, at *4 (W.D.N.Y. Oct. 17, 2019).
>
> As the Court said, the applicable rule is that "in a case such as this, the ALJ, while entitled to disagree with the medical opinions, can do so only for reasons which have a sound basis in the record itself." *Id*.

*Starcher v. Comm'r of Soc. Sec.*, 2020 WL 6737403, at *4 (W.D.N.Y. Nov. 16, 2020).  And, as this Court observed in *Deshotel v. Berryhill*, 313 F. Supp. 3d 432, 435 (W.D.N.Y. 2018),

> the leeway given to ALJs to make "common sense judgments" does not necessarily extend to the assessment of mental limitations, which are by their very nature "highly complex and individualized." *Nasci v. Colvin*, 2017 WL 902135 at *9, 2017 U.S. Dist. LEXIS 31937 (N.D.N.Y. 2017) (because mental limitations determinations are extremely complex, an ALJ's mental RFC finding cannot be rendered solely on common sense, but requires medical opinion evidence).

The combination of these factors leads the Court to conclude that the ALJ's decision cannot stand.  As a result, the case will be remanded for further proceedings.

### V.  CONCLUSION AND ORDER

-7-

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 11), **DENIES** the Commissioner's motion (Doc. 14), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

**/s/ Terence P.  Kemp**
**United States Magistrate Judge**